The Attorney General has received your request for an opinion in which you ask: ". . . whether the provisions of Senate Bill 401 providing for `additional, nongermane duty' for the State Superintendent of Public Instruction and authorizing compensation therefore is violative of Article XXIII, Section 10, of the Oklahoma Constitution?" Senate Bill No. 401 ("SB 401") to which you refer was enacted as Laws 1980, c. 318, 1, et seq. The provisions of SB 401 include inter alia appropriations to the State Board of Education and, codified at 70 O.S. 3-108 [70-3-108] (1980), the following: SECTION 4. "It shall be the additional, nongermane duty of the State Superintendent of Public Instruction to: "1. Develop guidelines and regulations relative to staff development, entry-year assistance programs and curriculum testing programs and further to work with colleges of education to strengthen the teacher preparation programs; "2. Initiate a pilot project which will facilitate automated reporting for school districts; "3. Serve on the Oklahoma Citizens Commission on Education; "4. Develop a program to assist school districts in removing and/or encapsulating asbestos in public schools; and "5. Formulate plans for the development of future educational leadership for Oklahoma, particularly in the superintendency. "Before the State Superintendent shall be authorized or required to perform such extra duties, he shall file a certificate in the office of the Secretary of State setting forth his willingness to perform said services. Thereupon, for such additional nongermane duties noted above, the State Superintendent shall receive Ten Thousand Dollars ($10,000.00) annually, payable monthly during his term, effective July 1, 1980, provided his total annual compensation as State Superintendent of Public Instruction does not exceed the sum of Forty-five Thousand Dollars ($45,000.00)." Your question is specifically prompted by reason of the provisions of Article XXIII, Section 10 of the Oklahoma Constitution providing: "Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; . . . ." A similar provision appears in Article VI, Section 34 of the Constitution having specific application to Constitutional officers, including the Superintendent: "Each of the officers in this article named shall, at stated times, during his continuance in office, receive for his services a compensation, which shall not be increased or diminished during the term for which he shall have been elected; nor shall he receive to his use, any fees, costs, or perquisites of office or other compensation." The rule of law has long been settled that ". . . a public officer is bound to perform the duties of his office, however onerous they may be, for the compensation fixed by law." Finley v. Territory, 12 Okl. 621, 73 P. 273 (1903), Syllabus 5. The obligation to perform the duties of office extends equally to additional duties which may be imposed upon the office after a term commences so long as the additional duties are germane to the office. Board of Commissioners v. Bruce, 51 Okl. 541, 152 P. 125 (1915), relying in part on Moore v. Nation, 80 Kan. 682, 103 P. 107 (1909). As explained in Moore v. Nation, supra at 103 P. 110: "The Constitution provides for the election of a superintendent of public instruction, whose duties are not defined, and might have provided for the election of a state geologist. Can it be claimed with any show of reason that the Legislature could compel either of them to become ex officio warden of the state prison or superintendent of the state lunatic asylum? It is not usual in state Constitutions to define the particular duties of subordinate officers; that being the peculiar province of the Legislature, which, it is to be presumed, will prescribe only such duties as in their nature have heretofore appertained to similar offices elsewhere. In the performance of this duty, the Legislature may rightfully exercise a wide discretion. It may assign to each of these officers any duties, which, by the most liberal interpretation, can be held to come within the general scope of that class of duties which have usually appertained to such officers, as they were understood by the framers of the Constitution." 103 P. 112 ". . . The court is inclined to regard the distinction between duties which "belong" to an office and duties which may be "attached" to it as artificial and unsubstantial. The duties of an office include all those that fairly lie within its scope; not merely those which are necessarily involved in the accomplishment of the main purpose of the office, but those also which, although incidental and collateral, naturally and properly serve to promote and benefit the performance of the principal duties. Constitutions and statutes seldom define with precision the scope of any office. The place it usually occupies in political systems of like character is some guide. The common law is relied upon to supply many incidents, and others are left to inclusion by necessary implication. In time the need becomes apparent for further or better definition, and it is said new duties are added, or "attached," germane to those already in existence. In reality the true scope of the office already included such duties. All that is accomplished is to make active that which before was latent. If the office does not potentially embrace the duty, the duty appertains to another office. Before any duty can be classified as falling within the scope of an office, it must belong there, and nothing can be added or attached to an office that does not belong there. Whatever the standard of classification — in aid of the usual functions, incidental, collateral, appertaining, or germane to or connected with the principal duties, in line with the main purpose, or other test — when tested the duty belongs to the office, is official, and the incumbent must perform it, or it does not belong to the office, is unofficial, cannot lawfully be attached to the office, and need not be performed if an attempt to attach it to the office be made." The concept expressed by Board of Commissioners v. Bruce and Moore v. Nation, each supra, is firmly implanted in the body of law constructing Article XXIII, Section 10 relating to salary and emoluments of public officials and Article VI, Section 34 relating to elected constitutional officials. State v. Carter, 170 Okl. 50, 39 P.2d 134
(1934); Phelps v. Childers, 184 Okl. 421, 89 P.2d 782
(1939); Bond v. Phelps, 200 Okl. 70, 191 P.2d 938 (1948); Aubrey v. Huser, 201 Okl. 60, 201 P.2d 249 (1948); Hunt v. Logan, Okl., 390 P.2d 918 (1964); Breeden v. Nigh, Okl.,441 P.2d 981 (1968). As expressed in State v. Carter, supra at 39 P.2d 137: "Clearly it appears from our Constitution that it was the intention of the framers thereof and the people in adopting the same to fix the salaries of constitutional officers and to provide that the salaries and emoluments of constitutional and legislative officers shall not be changed after the election or appointment, or during the term of office of any such officers, unless by operation of law enacted prior to such election or appointment." It is settled law that the salary of elected public officials may not be increased during the term of office except by statutes enacted prior to the commencement of the term, but which become operative during the term. State v. Carter, supra; Barton v. Derryberry, Okl. 500 P.2d 281, 282 (1972). A corollary to the rule, however, is equally well-settled, that is, where new duties or services imposed upon a public official are foreign to or beyond the scope and range of and not germane to the duties of the office, an increase of salary or emoluments of the official, notwithstanding that the increase is enacted during the term of office, is constitutionally valid. Phelps v. Childers, supra; Bond v. Phelps, supra; Aubrey v. Huser, supra; Breeden v. Nigh, supra. The foregoing history merely assists in focusing the scope of your inquiry to the fundamental question posed: Are the duties imposed upon the Superintendent by the provisions of SB 401 foreign to or beyond the scope and range of and nongermane to the duties of the office so as to escape the language of Article XXIII, Section 10 and Article VI, Section 34? If the question is answered in the affirmative, the salary increase for the Superintendent provided for in SB 401 is constitutionally valid; if answered in the negative, the salary increase is voided by the provisions of the Constitution. In formulating the "germane/nongermane" test, the court in Phelps v. Childers, supra, citing extensive authority, characterized the nature of "nongermane" duties. Variously, the test for nongermane duties was described as duties "wholly outside" of or "foreign to" the office, "separate and distinct" from the office and duties "which could as well be performed by any other person." By way of summary, the Phelps v. Childers Courts in authorizing the payment of three Supreme Court justices for the compilation and annotation of procedural statutes, said: "When a statute imposes duties or calls for the performance of service that is nongermane and beyond the scope of the duties of the office as the same existed prior to the enactment of the statute, the one holding such office may not be required to perform the nongermane duty or service and cannot be disturbed in the enjoyment of his office for his refusal to do so."184 Okl. 473. In Bond v. Phelps, supra, the Court, holding as nongermane the additional duty of members of the Corporation Commission to compile and annotate oil and gas laws and regulations, concluded: "However, the duties imposed by House Bill 172 are new duties. They are not regulatory. They are such as might have been, without criticism contracted by the State to publishers or savants. Had such contract been made, the powers and duties of the Corporation Commission, individually or collectively, would not have been lessened one whit. Nor does this law impose any additional power upon the Commission. Rather, it offers employment, to the individual Commissioners, to be performed so as not to interfere with their regular constitutional and statutory duties. We believe these duties to be nongermane to the previous powers and duties of the members of the State Corporation Commission." 191 P.2d 946. The Superintendent is an elected constitutional officer, Article VI, Section 1, Okl. Const., with a fixed term of office of four (4) years, Article VI, Section 4, with duties prescribed constitutionally, Article XIII, Section 5, Okl. Const., and by statute. See generally 70 O.S. 1-101 [70-1-101] et seq. and 70 O.S. 3-101 [70-3-101] et seq. (1971), as amended, as pertinent portions of the Oklahoma School Code ("Code") . The Superintendent is both member and President of the State Board of Education ("Board"), Article XIII, Section 5, Okl. Const., the governing board of the State Department of Education ("Department") and the "public school system of the state." Code, 70 O.S. 1-105 [70-1-105]. B. The Board, either as required by law or as it may establish by regulation, has authority to define and authorize all educational services, functions and activities for public schools of the State, Code, 70 O.S. 1-107 [70-1-107]. The powers of the Board are more specifically outlined in the Code at 70 O.S. 3-104 [70-3-104], the most recent amendment of which was enacted as laws 1978, c. 85, 1, et seq., effective January 8, 1979. Without reciting the full scope of the Board's authority over the public school system of the State, suffice it to say that 70 O.S. 3-104 [70-3-104] contains multiple paragraphs describing that scope. The conclusion is inescapable that the Superintendent, as executive officer of the Board, is responsible for the administration of every facet of the public school system in Oklahoma; 70 O.S. 3-104 [70-3-104], subparagraph 23 provides that the Board shall ". . . have authority and is hereby required to perform all duties necessary to the administration of the public school system in Oklahoma as specified in the Oklahoma School Code; and, in addition thereto, those duties not specifically mentioned herein if not delegated by law to any other agency or official. It is concluded that the duties imposed upon the Superintendent under the provisions of SB 401 are germane to the office of Superintendent of Public Instruction. No other department, commission, agency or bureau is authorized by either the Constitution or Statutes to formulate teaching staff development guidelines and regulations to facilitate methods of reporting for school districts, to develop programs to prevent pupil health hazards or to plan for the future educational leadership in Oklahoma than is the Board/Department of Education, of which the Superintendent is a member, President and executive officer by constitutional and statutory provisions in effect when the Superintendent assumed office in 1978. Such duties as assigned in SB 401 — and characterized as nongermane — were expressly or necessarily implied in the duties and nature of the office existing prior to the enactment of SB 401. It is, therefore, the official opinion of the Attorney General: 1. The duties described and assigned to the Superintendent of Public Instruction under the provisions of 4 of SB 401, Laws 1980, c. 318, codified as 70 O.S. 3-108 [70-3-108] (1980), are germane to the office of the Superintendent of Public Instruction. 2. That portion of 4 of SB 401 which permits the payment of sums annually for the performance of duties described therein during the term of the incumbent Superintendent of Public Instruction is in conflict with the provisions of Article XXIII, Section 10 and Article VI, Section 34 of the Oklahoma Constitution and are invalid; 3. By reason of the severability provision of SB 401, the remaining portions of SB 401 remain valid and effective. (MANVILLE T. BUFORD) (ksg)